May it please the Court, Thayne Somerville for the Quachan Tribe. I intend to reserve five minutes of my time for rebuttal. The Tribe is asking the Court to vacate the record of decision for the right-of-way for the Ocotillo Project because the Department of the Interior failed to determine whether the project meets the applicable substantive standard for Class L lands. Instead, they applied a different and much less protective standard than is required by the CDCA plan. Thus, the right should be vacated and the matter remanded back to the Department of the Interior. The Class L land designation requires the BLM to protect sensitive resource values and to ensure against significant diminishment of such resources. This is a substantive and enforceable standard that is intended to control and govern the type and degree of land use on Class L lands in the CDCA plan. In its record of decision... I guess I'm having trouble with your argument, and let me maybe put it to you so you can respond. It didn't seem like your clients challenged the FEIS. We have only challenged one aspect of the environmental impact statement related to cumulative impacts, but in general, our claim... But in general, it just has to do with whether the CDC plan allows for this, right? Right, and that is a substantive argument. I understand it's a substantive argument. What about the plan amendment? The plan amendment is separate from the right-of-way decision. Under the... Well, but under the... As I understand it, the decision to grant the right-of-way itself was consistent with the CDCA plan because there was a plan amendment. That's not correct. All right, tell me why. Under the way the CDCA plan works, before any site can be considered for energy generation, the site has to be identified as suitable for energy generation in the plan. That is what required the plan amendment, but the plan amendment was not site-specific. So for example, just because the plan is amended to say this site can be suitable for wind energy generation, that doesn't mean that it could be suitable for projects that are inconsistent with the substantive class L standard, meaning it doesn't mean that it's suitable for all and every type of wind or energy project. The separate site-specific determination regarding the specific project is the right-of-way determination. So you have one decision that says this site is in general suitable for energy generation. Now we can consider whether this specific project can be approved under the substantive requirements of the plan. The plan amendment doesn't change whether you look at the class L standard. It doesn't say that every project is suitable on these lands. You can't ignore the overriding class L substantive standard just because there's a plan. I understand the CDCA plan, and I understand what it says under the plan, and I understand that we're talking about the general class L requirements, but it seems to me reviewing the plan amendment that it's a Category 3 amendment, it gives specific use or activity that requires additional analysis, and that it was for a refined project which was approved. I think there's no question in the Record of Decision and in the EIS that there were two determinations made. One was the plan amendment, and one was the right-of-way for this specific project that we're challenging. But without the amendment, they couldn't have had the project. Well, that's true. And so when they had the amendment, and then they put forth the project, then if you look at the plan plus the plan amendment, then why can you not have the project? I guess that's the part of your analysis I never did see. Because the project is still not consistent with the substantive class L standard. The plan amendment says that this site in general is suitable for wind energy. The CDCA plan already says that wind projects may be allowed. I agree. And our argument is that just because the plan amendment says that now this specific site is suitable for wind energy, the guidelines in the CDCA plan says that wind energy may be allowed, that still doesn't lead to the conclusion that every and any wind energy project is appropriate on the class L land. You can't ignore the actual substantive requirements of the class L land. You still have to decide whether this right-of-way, the separate decision from the plan amendment, is consistent with the substantive requirements of class L land management. What are the substantive requirements? As I read the table, it says that electrical generation facilities, including wind and solar, may be allowed after NEPA requirements are met. That just seems to throw everything then into NEPA, which aren't really challenging except for the cumulative effects. That guideline says that wind and solar energy projects may be allowed if an EIS is prepared. But again, that doesn't mean, and it doesn't say, that all and every wind energy project or all or any solar energy projects are allowed. It says that same language in class L, M, and I. So it seems like you still have to read those guidelines in the context of the class. What guidelines am I missing here? When it says may be allowed after NEPA requirements are met, it seems to again throw everything into NEPA, which you're not really challenging. It's challenging the other cases that have been filed here, which we'll hear this morning. What you are, I think I would direct you to, is that excerpt of record 732, which is the actual class L designations and the language of the actual class L designations, which says that on multiple-use lands, they are managed to protect the resources and are managed to ensure that sensitive values are not significantly diminished. And that's the substantive standard that you're referring to? That's right. And this is legally enforceable? Yes, absolutely. How does the court enforce that language? Well, the standard is enforceable pursuant to FLIPMA and the fact that land use plans are substantively enforceable and have to be followed by the agency. Now, what that language actually means and how it would be interpreted is up to the Department of the Interior. But in this case, the Department of the Interior never actually answered this or evaluated anywhere in the record of decision whether this project meets this standard. Does this project meet the substantive standard of class L? Counsel, we have 4,000 pages of an EIS here. It goes through culturally sensitive matters that were of concern to the tribes. It goes through questions of the raptors. We're going to hear about the bighorn sheep, I suspect, in a little bit. How can you say that they didn't consider this? They considered. That's exactly what they argued. They considered impacts under NEPA in an EIS, and they say that they mitigated and minimized impacts to the extent practicable. And I think that standard, that standard of what they actually did, would be very consistent with a different land use class in this case. It would be very consistent with either class M or especially the class I category. Well, class I will allow you to do just about anything. So what particular language in the multiple use class L description did the Department of the Interior violate here, and that you think that this court can enforce? They violated the requirement that they ensure that sensitive, let's take scenic. They certainly violated the requirement to ensure that sensitive scenic values are not significantly diminished, and we know that from the department's own visual resources analysis in their final EIS, which says that the sensitive scenic resource values will be significantly impacted. They didn't use the word diminished because they didn't concede throughout this entire process that this class L designation creates a substantive standard. So they didn't actually analyze in the record decision, despite the fact that they did consider impacts in an EIS, they did not take that information and then apply it to the class L designation. They did not determine whether the impacts that they considered meet the standard of protection required under class L lands and ensure that the values that are required to be protected are... And the table that's at 734, which is two pages later, which is the one that I was quoting from, says that you can put wind projects on a class L project as long as it otherwise satisfies NEPA. You're telling us that such projects, wind projects like the turbines, will always disrupt scenic, and therefore they may never be approved. That seems to be contradictory. I don't think that's true. I think that there could be lands where it doesn't have sensitive scenic values. Not all class L lands are the same. And I believe that the judgment here was that there weren't any particular ridgelines that were distinctive in this particular valley. Well, I think that's inconsistent with the government's own analysis. In the visual resource analysis at exits of record 450 to 455, that says that there will be significant impacts to the visual resources in this case. And that's the government's own analysis. In addition, the government prepared a tribal cultural values report at exits of record 1197 to 98 that confirmed cultural and tribal values would be significantly impacted and severely affected. I'm reading from the government's own analysis. What they argue is that they considered the impacts and that they mitigated them to the extent practicable. And I read that as being consistent with the class I standard, which the language says, you know, class I, you can basically, it prioritizes development. You can basically put anything there. But still, reasonable protection will be provided for sensitive natural cultural values and mitigation of impacts on resources will occur insofar as possible. I read that to be very consistent with what they did here, but we're not on class I lands, we're on class L lands. It's a different standard. It's not sufficient to just consider the impacts. Yeah. Council, this whole thing feels very, very circular because they also acknowledged in the same plan that the possibility that you could put wind resources on a class L property. And they're going to have to do some balancing here. And it's clear that something may have to give. Apparently the guidelines make no differentiation between class L, M and I in terms of wind and solar energy. I think you have to read those guidelines, which say, they don't say that wind and energy, wind and solar energy projects shall be allowed or that they're always allowed and that there has to be an environmental impact statement done. It seems wrong to me that you would read those guidelines and that permission to build a project out of context with the class L, M and I standards that were basically the building blocks and the fundamental components of the plan. If you read the record of decision for the CDCA plan and the EIS for the CDCA plan, back in 1980, the public and interior believed that it was that division into the CL, M and I management that was going to provide the major distinctions of how these lands were going to be managed. Yes, wind and solar energy projects are not prohibited. They may be allowed just like they can on M and I lands. But if you read that authorization out of context without considering what kind of lands you're on, I think that's where the government went wrong here. And one, they never even considered whether this type of project, even after their environmental evaluation, they did not consider whether it would be consistent with the substantive class L standard. They just said, we've considered the impacts as the guideline state and we've mitigated impacts, we've made efforts to mitigate impacts to the extent practicable. That is the class I standard. That is not the standard for management on class L lands. And this has real world implications. I mean, the Koshan tribe was involved in another case that is cited in the materials that was very different than this wind farm case where the government approved 30,000 separate solar pedestals across 6,500 acres of land and conceded that there would be nearly 500 cultural resources destroyed. They used the same type of analysis in that case and said, well, the guidelines say we can, we've considered the impacts and we're going to build the project, but that does not meet, that did not meet the substantive standards for class L lands and did not meet the requirement to ensure that sensitive values are not significantly diminished. The same analysis was applied in this case. And the same analysis will be applied in many other cases because the government is wanting to develop these large utility scale energy projects all over the desert. And our argument does not preclude them from building them. Our argument says that class M and class I lands are the areas where they're most appropriate, and there may even be some class L lands that are entirely appropriate for wind and solar energy projects, but you still have to evaluate the project under the substantive standard that is set out in the, in the, in the, in the CDC plan for class L lands. So what we say in this case is that the government, even though they did an EIS and they considered the impacts, if you look at the record of decision and the actual decision language, they did not consider or evaluate whether or not this project substantively meets the requirements for the class L land management. And so for that reason, we believe that it should be sent back to the government, to Interior to at least make the determination and explain their reasoning why they did not evaluate the project under the class L standard. I'll reserve the rest of my time for rebuttal unless there's any further questions and we'll further submit my other issues that we briefed in the case. Thank you. Thank you, Mr. Somerville. Let's hear from the government. Mark Hague again for the United States. I think that the disagreement here is about what the plan requires the way that BLM reads it's, the California desert area plan is that the, the definition, the description of multiple use classes and class L, which is at has to be read in light of the multiple use class guidelines on the next, which begin on the next page where the plan says all land use actions and resource management activities on public lands within a multiple use class delineation must meet the guidelines given for that class. And one of the guidelines that's been mentioned is the guideline for wind and solar, which says wind and solar may be allowed on class L lands, provided NEPA is complied with. But there are, I believe it's 19 of these different guidelines and the record of decision goes through each of the guidelines that are applicable in this area, like the clean water act or the record of decision goes through each of the applicable guidelines and makes the requisite finding under the criteria that are established for that guideline and under the plan, plan element provision. So it is not the case that BLM ignored the fact that these are class, that these are class L lands. It applied the plan guidelines to make the determinations that it believes are required under the plan. The question came up earlier about the significance of the plan amendment. I was going to ask that question, but you, I thought you had some further to say about what you were just talking about. What's the significance of the plan amendment? Do you agree with council that it has no significance? I certainly don't agree that it has no significance. I agree with him that there are two separate decisions here, the decision to amend the plan and the decision to grant the right of way. They're addressed together and they are integral. One of the options that was discussed in the EIS, one of the alternatives that was discussed was amend the plan, but don't approve this project. And that alternative was not adopted. The alternative was, the chosen alternative is to amend the plan to specifically authorize the use of the project area for this wind energy project. So they are part and parcel, they are intertwined. And BLM's legal analysis, legal approach here was that we have to make two separate decisions and it made the right of way decision based on the land management classes and the class guidelines and plan elements. And it made the plan amendment decision under the plan amendment criteria. There is a list of six criteria. There are required findings. BLM complied with all those steps and procedures. Well, nobody even challenges that. That's right, your honor. No one challenges it. But if it has no effect, then we're back to looking at multiple use class L and we're looking at ER 734 to determine if they've done the correct analysis. Right. Well, and I guess my point is that it does have an effect and that there's something just completely illogical about the argument that if on the one hand BLM has amended the plan to say this area is appropriate for this project, for someone to come in and say, well, you can't approve this project because it's inconsistent with the plan. We just, BLM just amended the plan to say this project could go forward. If this were a statute and Congress had done what BLM did here, no one would argue, well, Congress amended the statute to say that the project could go forward, but you still have to comply with all these other things that it doesn't comply with. The plan amendment confirms that this project is consistent with the plan. But as we have addressed in our brief. So in this analysis, it seems to me, counsel, you're telling me that I'm going to go through this analysis for this CDC, this CDCA plan, and I'm going to make the analysis without an amendment. And if I can make the analysis work without an amendment, then the amendment just confirms that it was okay. Is that what you're telling me? Yes, your honor. I think that's a good way to put it. The amendment itself doesn't allow for this? I think if there were any doubt about whether this project is permissible under class L land, that doubt is eliminated by the presence of an amendment that says this project can go forward. Well, let's talk about the interim visual resource management classification. That seems to be his big point. The visual management provisions, the tribe's arguments about the visual  knowledge, the distinction between inventory designations, interim management designations, and designations that are included in the plan. The project area here has an inventory, was designated as inventory class three. Inventories are informational. They're not supposed to govern land management decisions. In most cases, the way that BLM applies its visual management guidelines, the land management plan includes visual resource management class designations. In this case, however, the California desert plan doesn't include designations. So there's an interim designation, and as a result, whenever the agency approves an individual project, it looks at an inventory, if an inventory hasn't done, it hasn't been done, it does an inventory, and then it makes an interim management classification to protect visual resources to the extent possible. As I understand it, the CDCA didn't have a VRI, didn't have a VRM class. It didn't even have an RMP, and therefore the BLM had to develop the interim VRM class designation. All you've told me is that's what's happened. They've inventoried. What he's suggesting is you didn't meet the class L standards in making what you had to do here. Well, that... And didn't give a basis for why it then matches. Interim classes and VRM classifications have to be consistent with the land use designation in the plan. I agree. Class L under the California desert plan, the guideline says wind, wind energy, wind and solar may be permitted. If wind and solar may be permitted, the only way that you can meet, the only class that wind energy can operate under is class three, visual, or class four visual resources. So BLM, there was confusion in the draft EIS about what the visual resource classification was going to be. But the analysis is not confused. It explains what the impacts are going to be, that there will be significant visual impacts because this is a big open valley and you can see the wind turbine. But at the end of the day, the agency did what it's supposed to do, which is it conformed the visual resource management class designation to the land use designation in the plan, which is... Class four. Right. Class four visual, class L permitting wind energy development. I guess to provide a little more context again, the agency in making this decision went to extraordinary lengths to coordinate with, to consult with the stakeholders. They went through a full National Historic Preservation Act process, which culminated in the adoption of a memorandum of agreement. They reached out to the tribe, they delayed deadlines to ensure that the tribe had the opportunity to comment, that the tribe's comments were considered. And in response to those comments, the project was substantially modified to address the tribe's concerns. 43, the proposal that was the preferred alternative in the draft EIS was 155 turbines. 43 turbines were eliminated from the alternative that was ultimately adopted in order to eliminate all direct impacts on cultural resources and mitigate to the greatest extent practicable impacts on visual resources. So there's a particular archeological cultural resource, a rock circle that's on the site that has views to Coyote Mountain and Sugarloaf Mountain. And those 43 turbines were eliminated so that the view from the geoglyph to the mountain peaks would not be obstructed. So this is a process where the agency went to significant lengths where the mitigation and consideration of impacts, where the process worked and the project was modified to eliminate direct impacts and limit indirect impacts to the extent practicable. It seems to me, and this is my sum up and not necessarily a sum up that is exact, but it seems to me what council's really arguing is that, sure, you made enough analysis to do multiple use for a class I, but you're not meeting the controlled multiple use resources while ensuring that sensitive values are not significantly diminished, which is a higher standard for class L. How do you respond? A couple of ways, and these are laid out step by step in our brief. The first is that... I know, but I want to hear, because I felt his argument and I'm not sure I feel he just gave it to me. So the first argument is that that not significantly diminished has to be understood in the context of what it says on the next page, land use actions have to meet the guidelines. The guidelines have standards for air, land, water, wildlife, vegetation, and they say wind power may be allowed. And the rod goes through and explains how the project complies with each of those individual elements of the guidelines. And that informs the interpretation of class L. Second argument... I just want to follow up on Judge Smith's argument, because I think what Mr. Somerville is saying is, look, if you look at table one, this is the table that I was talking about, that would not be allowed in a class C lands, but would be allowed in class L, class M, and class I. If I understand Mr. Somerville's argument, again, it's sort of interpreted through Judge Smith, that is, although it's permitted in all three of those areas, it's not permitted under the same standard. That is that you're going to have to make a higher standard as you move from I to an M to an L class lands. So what did the Bureau do here to ensure that it was going to satisfy the requirements of class I, class M, and class I class lands? If it's I, no problem, you're in. Well, it went through... Because the page 734 of the table, the provision for electrical generating facilities is not the only requirement applicable to... that informs the application of the guidelines. There are guidelines for land use activities that are different on class L, M, and I. And the rod goes through each of these numbered guidelines and explains how the project is consistent with that guideline as it applies to class... It's consistent... And depending on whether that particular guideline distinguishes between class L, class M, or class I... Well, it doesn't, but the point is that in the description of the classes themselves, that there's different language used. So even though wind is permitted in three of the four classes, his argument is you're going to have to meet a slightly different standard as you move from one class to the other. Even though the guidelines say, yeah, we can have wind power on a class and a different burden than if you're on a class M or a class I land. And what did you do to meet the higher standard? And he's further saying, you didn't even talk about the higher standard. Right. Because... Which I agree with him. Because BLM doesn't read that class L language, that description of class L as being operative independent of what's on the next page and the table, the guidelines. But I would also submit that this project does meet that not significantly diminished standard. And the way that BLM accomplished that was through the mitigation measures that I described. Eliminating 43 turbines, making sure that there are no direct impacts on resources or cultural resources and minimizing the indirect effect. The class L lands constitute, I think 5.9 million acres. This project, the entire project acre area is 10,000 acres. The disturbed area is 400 and some odd acres, maybe 500 acres. So the disturbed area is less than 0.001% of the available class L land. So that's another way to look at what constitutes significant diminishment. I want to save a little bit of time for co-counsel, if I may. Your Honor, Sven Branderickson again on behalf of Ocotillo Express. I'd start with the idea that these land classes are multiple use land classes. That the CDCA plan was adopted under direction of Section 601B of the Federal Land Policy Management Act, which directs BLM to manage these lands within the framework of multiple use and sustained yield. And as the Supreme Court noted in Norton, the job of multiple use and sustained yield is a difficult task of striking a balance among competing uses. And in essence, that's what this case is all about. We have a screen that's applied through those guidelines as to authorized uses of class L lands. And you have two authorized uses here. You have Native American cultural values and you have wind energy development. Both are authorized uses for class L lands. And you have an amendment that verifies that this is an authorized use for this particular site. That wind energy is an authorized use for this site. So you have to look at the plan and what does the plan tell BLM to do? It actually anticipates that there are going to be competing uses that are authorized and it tells the agency to use the tools in the plan to work out the and to find the appropriate balance for multiple use and sustained yield, which is their mission. And the two tools that are directed to use are NEPA and the National Historic Preservation Act consultation process, in particular for Native American values. That was done here. Basically two years of consultation with 14 tribes. This project started conceptually 244 turbines. By the time they started the scoping process for NEPA, it had been reduced to 193 turbines. During the scoping process, there were, and thereafter they were doing work on the site, 20,000 hours spent by archeologists with observers from the Native American community spent walking over the site, identifying cultural resources. As a result of that input, the project was downscaled to 155 turbines, avoiding all direct effect on cultural resources. After that step was taken, after the draft EIS was out, concern was raised about basically a visual impact on a traditional cultural property described generally as Eastern San Diego County and Western Imperial County. And so after much further discussion, the project was again reduced to reduce its visual impacts. So there was a very direct response to Native American values in reshaping this project, substantially reducing the project in response to those concerns. The direction that was used is to use the plan elements and the plan elements tell BLM and cultural resources to ensure cultural resources are given full consideration. Native American values give full consideration to Native American values, protect those values wherever prudent and feasible. And in energy production, avoid sensitive resources wherever possible. The ROD walks through each of those criteria, explains how they were met. So that is where the plan tells BLM to look for its decision criteria, not to try to make its decision with a vague balancing based on the description, but to actually apply those elements, the plan elements to make its decision. And that's what it did here. I think I'm out of time. Okay. Thank you, Mr. Brant Erickson. Mr. Somerville, you have some time reserved. May it please the court. Regarding Mr. Brant Erickson's point, there was lots of consideration and lots of NEPA analysis and even a fair amount of mitigation done on this project. But the tribe still believes that it does not meet the standard for class L lands because they did not ensure that those sensitive resources are not significantly diminished. And it doesn't really matter as much what the tribe believes. It matters more what Interior thought about that issue. But we don't know because the record of decision did not evaluate the project under that class L standard. We do not know Interior's position as to whether or not the mitigation was lower below the significant diminishment threshold. Can't we infer that from what DOI did in this case, which is to approve the project? Well, but we have to... The question for this court is, is the class L standard that we talked about, an extra pursuit of record 732, a substantive standard that governs Interior's management of the lands at issue in this case? If they're going to approve a massive wind project, they need to evaluate the project and actually make a determination as to whether or not the project meets that substantive standard. They did not do that in this case. What they did in this case and the standard they applied is found at page 32 of the government's answering brief in which they say their decision is because the plan gives BLM discretion to authorize wind power so long as NEPA requirements are met under the guidelines and so long as impacts are considered and minimized to the extent practicable. That's not the class L standard. Under class L lands, they have to ensure that there's no significant diminishment of the resources. We contend they did not do that and we contend the record supports findings that at least some of the resources remain significantly diminished, such as resources when you have 112, 400 foot tall towers in this area, but Interior did not decide that. They did not render their opinion in their record of decision as to whether that standard was met. If this court agrees with our argument that there is a substantive element and a substantive component to land management under the CDCA plan, at minimum, the rod needs to be vacated and remanded back to Interior to allow them to the project as mitigated meets the substantive standard under class L lands, whether as approved and with the mitigation approved, the sensitive resources at issue are or are not significantly diminished. In our view, the government and Pattern Energy in this case have read the plan backwards. They're focusing on the plan elements and the guidelines, but ignoring the fundamental direction as to how you manage the class L lands. Remember the plan elements apply desert wide. The plan elements don't distinguish between CL, M and I. They provide direction as to some considerations that the land manager has to make when they are managing the lands, but those are class wide. The guidelines related to wind and solar energy in this case, at least for L, M and I, they don't make any distinction between renewable energy. They say it may be allowed so long as an EIS is prepared. Where you get the distinction and the differences in the standards is that excerpts of record 732. That is where you find how you apply the plan elements and the guidelines in context of what lands you are on, and they never did that in this case. One other specific citation to the excerpts of record in the plan elements at excerpts of record 743, there's a heading under mitigation related to cultural resources, and it says mitigation will be employed primarily in classes M and I, where resource protection measures cannot override the multiple use class guidelines. I think the implication here is that resource protection measures can override the guidelines on class L and C lands. I think it's also important to note that the word mitigation doesn't even appear in the substantive standard for class L. The word mitigation only appears in M and I, so if you're on class M and I lands, development takes priority over resource protection, but the plan still requires mitigation. It still requires the government to make best efforts to mitigate impacts. You don't find that kind of a concept in the class L definition. You find the words protect the resources and ensure against their significant diminishment. Now, mitigation measures can still be applied on class L, but in our view, only to ensure that you get below that standard, to still ensure that significant diminishment of resources doesn't occur. I believe my time is up, unless you have any further questions. Okay. I don't think there are. Thank you, Mr. Somerville. I thank all council for the argument. The Eshan tribe of the Fort Yuma Indian Reservation versus the interior is ordered to submit it.
judges: Farris, Bybee, N.R. Smith